## WILLIAM G. PIERCE & wife *vs.* PROPRIETORS OF SWAN POINT CEMETERY & ALMIRA T. METCALF.

The Roman, canon, and English ecclesiastical law, stated. *Held,* that while a dead body is not property in the strict sense of the common law, it is a *quasi* property, over which the relatives of the deceased have rights which the courts will protect. *Held,* that the persons having charge of a dead body hold it as a trust which a court of equity will regulate.

BILL IN EQUITY, brought by William G. Pierce and Almira F. Pierce, his wife, the latter being the only child and heir at law

of Whiting Metcalf, deceased, against the "Proprietors of Swan Point Cemetery," a corporation duly created under the laws of Rhode Island, and against Almira T. Metcalf, widow of said Whiting Metcalf.

The bill alleged, in substance, that Whiting Metcalf died on the 4th day of May, 1856, leaving his daughter, said complainant, Almira F. Pierce, his sole heir at law, and the said Almira T. Metcalf, his widow ; that the said Whiting Metcalf, during his lifetime, had conveyed to him a burial lot in the First Congregational Society's Burial Ground in Swan Point Cemetery ; that he was a Unitarian in religious belief, a communicant of that denomination, and a prominent member of the so-called and well known "First Congregational Society of the City of Providence ; " that the burial lot so purchased by him was one of a "family group of lots," of which group the several lots were owned and held by the brothers and kindred of said Whiting Metcalf ; that upon his decease he was buried in said lot, and, as the complainants averred upon belief, in accordance with his wishes and desires expressed during his lifetime, and with the approbation of his widow ; that he remained so interred for about thirteen years ; that said lot became immediately after his decease the absolute property, by descent, of the said complainant Almira F. Pierce, his only child, heir at law, and next of kin ; that about the 22d of July, 1869, the respondent, Almira T. Metcalf, requested in writing the permission of "the gentlemen having charge of the Unitarian Cemetery for the removal of his remains," setting forth her reasons, viz. : that she had secured a lot in Swan Point Cemetery, and wished to remove to it the remains of her late husband, and there erect a suitable monument to his memory ; that such consent was refused "without the written request of the relatives, countersigned by the society's committee ; " that afterwards the complainants protested to the actuary of the defendant corporation against such removal, positively forbidding the same ; and that the filing of said protest was known to the respondent, Almira T. Metcalf, before the removal, as the complainants averred upon information and belief.

The bill further alleged that in 1869 the remains of said Whiting Metcalf were forcibly, without the authority, consent, or approval of the complainants, in violation of the by-laws

of the defendant corporation, in violation of law, of right, and of the sacredness of the tomb, removed, under the direction of the said respondent, Almira T. Metcalf, from the lot aforesaid, and placed in another lot in said cemetery. That after the body had been removed, and while it was exposed, the superintendent of said cemetery did not direct its immediate reinterment, but permitted its interment in the lot to which it had been removed ; that on the 9th day of August, 1869, the complainants requested the directors of the defendant corporation to restore said remains to the place whence the same had been taken ; that the defendant corporation neglected and refused to comply with such request, but afterwards passed a vote declaring that what had been done was in violation of their by-laws ; that on the 21st day of February next following, the complainants notified the respondent, Almira T. Metcalf, of their protest before referred to, requesting and desiring her to restore said remains to the place from whence they were taken ; that said request had been refused ; and that said acts and doings were in direct, absolute, and palpable violation of right. The prayer of the bill was that the defendant corporation might be decreed to restore and replace said remains in the lot from whence they were taken, and that the said Almira T. Metcalf might be enjoined from interfering with or in any manner preventing, or attempting to prevent, said restoration and replacement, and also perpetually enjoined from again removing or intermeddling with said remains.

To this bill the respondent, Almira T. Metcalf, filed a general demurrer for want of equity. The proprietors of Swan Point Cemetery filed an answer, in which they denied the jurisdiction of the court to direct or control the management of their internal affairs, or in the subject matter of the bill, so far as relief was prayed against them, but stated that they believed all the facts stated and charged in the bill to be true, and submitted to execute, or allow to be executed within their grounds, such order and decree in the premises as the court might see fit to enter up between the other parties to the bill.

*B. F. Thurston & John D. Thurston*, for the respondent Almira T. Metcalf, in support of the demurrer. The bill complains that the remains of Whiting Metcalf have been taken from the place where they have rested for thirteen years, and

been removed to another lot in the same cemetery and there buried ; but it does not aver, nor pretend to intimate, that said removal was not done with becoming decency, or that due honor and respect have not been paid to the buried remains in their new surroundings. Indeed, the bill sets forth that in the written application of Mrs. Metcalf for the removal of the body, she based it upon the reasons that she had " secured a lot of ground in Swan Point Cemetery," and wished " to remove to it the remains of her late beloved husband, Whiting Metcalf, and prepare a suitable monument to his memory." There is nothing to show that this has not been done.

Again the bill, after setting forth that the said Whiting Metcalf was the owner of a certain lot in that part of Swan Point Cemetery known as the First Congregational Society's Burial Ground, adds these words : " The said Whiting Metcalf being an Unitarian in religious belief, a communicant of that denomination, and a prominent member of said First Congregational Society." This statement is either mere surplusage or else it is inserted for the purpose of making it a part of the complainants' case that the religious sentiments of the deceased have in some way been disregarded and violated ; that he has been torn from the companionship of his own faith and made to sleep with those who are alien to him in belief. But creeds are for the living, not for the dead, and perhaps in the new light that is now vouchsafed him, his predilection for Unitarian association may have become somewhat impaired. However this may be, it is certainly not for a court to decide whether it profits a man more or less to be buried under the shadow of any particular creed. To assume jurisdiction over such a question is not to minister to the welfare of the departed so much as to pander to the prejudices of the living.

A careful study of the complainants' bill fails to elicit any sufficient grounds for the relief therein prayed for by them, or in fact any grounds whatever except a pretended disregard of filial affection, and a preference on their part that the remains of the deceased should rest in one particular spot rather than another. Neither of these reasons are of any validity, unless supplemented by the fact that the complainants have a better right to the guardianship of the remains in question than the respondent Al-

mira T. Metcalf.  Without discussing immediately in this connection how far the court can aid them, providing they establish such right, it is well, perhaps, to discuss in the first place the question whether such right really exists.

I. In the guardianship of the remains of a deceased person, the marital right prevails over that of the next of kin.  The bond of matrimony is the closest of all human ties.  Though having its foundation and inception in a civil contract between two hitherto independent individuals, it becomes when executed a relation and a *status*.  The rights and obligations growing out of the marriage relation do not cease with the death of one of the parties.  The survivorship of such rights and obligations is clearly recognized by the law.  Under the statutes of Rhode Island the husband is entitled to the administration of his wife's personal estate in case of her intestacy.  Rev. Stat. chap. 156, § 7.  And in respect of the particular marital right of custody over the remains of a deceased consort, see *Durell* v. *Hayward*, 9 Gray, 248.

II. The marital right of such guardianship is in the wife equally with the husband.  If the proposition is correct, that it is the " indisputable and paramount right and duty of a husband to dispose of the body of his deceased wife," the converse of that proposition seems equally true.  The Revised Statutes, chap. 156, § 4, provide that administration of the estate, both real and personal, of a person dying intestate, shall be granted to the widow or next of kin, placing the widow first and thereby giving her the preference.  If the principle is established that the right of custody over the remains of Whiting Metcalf vests in his widow, rather than in his heirs at law, then of course there is an end of the case.  They are now under her custody and control.  But if the question is still an open one, the respondents contend further as follows.

III. Equity has no jurisdiction except in cases where rights of property are concerned.

The subject matter of the jurisdiction of the' Court of Chancery is civil property.  The court is conversant only with questions of property and the maintenance of civil rights.  Injury to property, whether actual or prospective, is the foundation on which the jurisdiction rests.  The court have no jurisdiction in

matters merely criminal or merely immoral, which do not affect any right of property. The possible effect of the acts and conduct of one man on the reputation of another is not a ground for the interference of the court unless there be an injury to property. Kerr's Injunctions in Equity, pp. 1, 2, and cases there cited.

If, then, equity has no jurisdiction except in cases involving the rights of property, it at once becomes a pertinent question as to whether there is any right of property in a dead body. Lord Coke, 3d Inst. 203, says: " It is to be observed that in every sepulchre that hath a monument, two things are to be considered, viz., the monument, and the sepulture or burial of the dead. The burial of the *cadaver* is *nullius in bonis*, and belongs to ecclesiastical cognizance ; but as to the monument, action is given at the common law for defacing thereof." Compare 2 Black. Com. p. 429 ; *Meagher* v. *Driscoll*, 99 Mass. 281.

The case last cited clearly points out where and in what manner the complainants are to seek their remedy, if any they are entitled to. They are not to go to a court of equity, but to a court of law ; not to ask for the remedial and preventive relief prayed for in their bill, but to sue for their damages in an action of trespass ; not to found their complaint upon a violation of the by-laws of the defendant corporation, or upon a violation of the " sacredness of the tomb," but to base their action upon a trespass *quare clausum fregit* (not *de bonis asportatis*).

IV. A court of equity will not intervene in behalf of the complainants to grant the relief by them prayed for, for the reason that the same is against public policy.

*James Tillinghast*, for the Proprietors of Swan Point Cemetery.

*Browne & Parsons*, for the complainants, *contra*. I. Courts of equity have full jurisdiction, and such jurisdiction has been frequently exercised, to protect and preserve the repose of the dead, and if they can so protect and preserve, they can equally give relief against injury suffered from a disturbance of such repose, particularly if there be no remedy, or an incomplete and inadequate remedy at law. *Beatty et al.* v. *Kurtz*, 2 Pet. 566 ; *Price* v. *Methodist Church*, 4 Hammond (Ohio), 515 ; *In the matter of the Brick Presbyterian Church*, 3 Edw. Ch. 155; *Wendt* v. *German Reformed Church*, 4 Sandf. Ch. 471. It may

be admitted that the right of a municipal corporation to take burial lots or cemeteries for public uses, such as streets or highways, cannot be restrained. Nor can the right of a church or corporation established under statute, owning a cemetery or burial ground, acting in accordance with law and under legal authority, to sell and dispose of the land for other purposes, be enjoined by the owners of lots. But the above authorities establish the jurisdiction of courts of equity to protect and preserve the repose of the dead, except when the same is disturbed for public purposes, or under regular legal proceedings. If they have power and jurisdiction to restrain the disturbance of such repose, they have equal power to grant the relief which may be full, adequate, and proper, after such disturbance has been committed.

In the case at bar there has been committed a public wrong. A dead body has been illegally disinterred. This is an indictable offence. Rev. Stat. tit. xxx. chap. 216, § 21 ; *Commonwealth* v. *Loring*, 8 Pick. 370 ; *Commonwealth* v. *Cooley*, 10 Pick. 38 ; *State* v. *McClure*, 4 Blackf. 328. There has also been a private injury committed for which the complainants have their action of trespass *quare clausum* against both respondents. *Meagher* v. *Driscoll*, 99 Mass. 281. But this is not full or adequate relief. The complainants have other rights which call upon the protecting power of a court of chancery " to preserve the repose of the ashes of the dead, and the religious sensibilities of the living."

II. The body of Whiting Metcalf, deceased, belonged to his only child and next of kin as property, and she had the right to dispose of it as such, within restrictions analogous to those by which the disposition of other property may be regulated. See Report of Hon. Samuel B. Ruggles, as referee to the Supreme Court of the State of New York, in 1856, " in reference to compensation to owners of vaults in cemeteries, and to relatives of individuals buried in graves, disturbed by legal proceedings." [1]

---

[1] This report was printed by order of the Senate, Feb. 17, 1858. A portion of it is attached in the form of an appendix to the fourth volume of Bradford's Surrogate Reports, p. 522. It was reprinted in full by the counsel for the complainants, and handed to the court with their brief. It is a very learned and exhaustive treatise on the law of burial, and will prove of great value to members of the profession interested in this subject. — REPORTER.

The counsel. after quoting fully from this report, cited its conclusion as follows: " It is believed that the following legal principles are justly deducible from the fact that no ecclesiastical element exists in the jurisprudence of this state, or in the framework of its government: 1. That neither a corpse nor·its burial is legally subject, in any way, to ecclesiastical cognizance, or to sacerdotal power of any kind. 2. That the right to bury a corpse and to preserve its remains is a legal right, which the courts of law will recognize and protect. 3. That such a right, in the absence of any testamentary disposition, belongs exclusively to the next of kin. 4. That the right to protect the remains includes the right to preserve them by separate burial, to select the place for· sepulture, and to change it at pleasure. 5. That if the place of burial be taken for public use, the next of kin may claim to be indemnified for the expense of removing and suitably reinterring the remains." See, confirming this report, *Bogert* v. *City of Indianapolis*, 13 Ind. 138; also *State* v. *Tate*, 6 Blackf. 112; *State* v. *McClure*, 4 Blackf. 328; *Wynkoop* v. *Wynkoop*, 42 Pa. State, 293; American Law Review for October, 1871, p. 182; *In re Pope*, 5 Eng. L. & E. 586.

We think we may assert as an absolute truth in Rhode Island, " that no ecclesiastical element exists in the jurisprudence of this State (Rhode Island), or in the framework of its government." We do not believe that any one would dare to suggest the contrary doctrine. And should this court declare that such contrary doctrine is law to-day, there might be expected a disturbance in the grave of Roger Williams himself. Yet if the doctrine of Coke, that there is no property in a dead body, be law, and if this court sustains it as law, it can be upon no other theory, principle, or practice, than that an ecclesiastical element does exist in this state, and in the framework of its government.

III. The respondent Almira T. Metcalf, the widow of Whiting Metcalf, had no right of property or of *quasi* property in, or control over, the remains of her dead husband. Any and all rights which she may have claimed as widow ceased and determined, if they ever had an existence, on the burial of the body in 1856. *Wynkoop* v. *Wynkoop*, 42 Pa. State, 293.

IV. The remedy of the complainants is only by and through a court of equity, and the relief to which they are entitled is

that for which they pray in their bill. There is no action or proceeding at law through which adequate relief can be obtained. It can only be had through a court of equity. If there be no "ecclesiastical cognizance" to trammel our courts, if the dead be not wholly ' *nullius in bonis*,' the right to bury, to watch, to guard, to protect, —the right to the absolute custody and control of the dead rests, and must rest, in the next of kin. Such was the Roman civil law, such was the law of the Saxons, such was and is the common law of England, relieved from the idea of ecclesiastical cognizance. Such has been declared to be the law of New York, and that declaration has been affirmed in Indiana, Pennsylvania, and Ohio. We ask this court to adopt and declare as the law of burial in Rhode Island, the law which has thus been declared and affirmed.

POTTER, J. In this case one of the respondents, Mrs. Metcalf, has removed the body of her husband from its former place of burial in Swan Point Cemetery, and claims that she had the right to do so, being, as his widow, entitled to the charge of it. The claim is resisted by his only child, the complainant.

It seems strange that controversies of this sort have not arisen often before. In Europe burials were matters of ecclesiastical cognizance, and the practice of burial in churches and churchyards common. In many parts of New England the parish system prevailed, and every family was considered to have a right of burial in the churchyard of the parish in which they lived, until they removed to another parish. In Rhode Island, from the scattered nature of the population in most parts of the state, it was early the practice to bury upon the family estate, and when the estate was sold the right was generally reserved. Burial grounds of this sort have remained to families for many generations, in many cases from the first settlement, and the dead are brought from a great distance to be buried among their ancestors and kindred. By the civil law of ancient Rome, the charge of burial was first upon the person to whom it was delegated by the deceased; second, upon the *scripti hæredes* (to whom the property was given), and if none, then upon the *hæredes legitimi* or *cognati* in order. Pothier, Pand. (Paris ed. 1818) vol. 3, p. 378; Corpus Juris. Digest, lib. 11, title 7, l. 12, § 4. But a body once buried could not be removed except

by the permission, in Rome, of the Pontifical College, and in the provinces, of the Governor. Pothier, *ante*, and Digest, lib. 11, title 7, ll. 8, 39, and 40. And by the Roman law there was a distinction of tombs into *familiaria* into which any member of the family might be admitted, and *hereditaria* for one's self and his heirs. Digest, lib. 11, tit. 7, l. 5. The heirs might be compelled to comply with the provisions of the will in regard to burial. Digest, lib. 5, tit. 3, l. 50. And the Pontifical College had the power of providing for the burial of those who had no place of burial in their own right. Taylor's Civil Law, 4to, 1755, p. 77.

By the canon law, which prevailed in such matters over so large a part of Europe, every one was to be buried in the parish churchyard, or in his ancestral sepulchre (if any), or in such place as he might select. A wife was to be buried with her last husband, if more than one. If a person permanently changed his residence, then he was to be buried in the parish churchyard of his new residence. Corvinus's Jus Canonicum; Voet ad Pandectas, ed. 1731, vol. 1, p. 602.

In England, by their ecclesiastical law, by which this subject was regulated, every person (with exception of traitors, &c.) had a right to be buried in the parish churchyard. And a claim of right by custom to bury as near relatives as possible, was held bad. The whole was under the direction of the ordinary, and was of ecclesiastical cognizance. And once buried, the body could not be removed without license from the ordinary. Burn's Ecc. Law, 8th ed. vol. 1, 251, 271, 372; *Kemp* v. *Wickes*, 3 Phillim. 264. And the person who set up a monument, or on his death, the heir of the deceased, might have an action for injury to it. 1 Burn, 373. And the husband was bound to bury his wife. *Jenkins* v. *Tucker*, 1 H. Black. 90. See for a full account, Bingham's Christian Antiquities, from which much of the historical matter in legal arguments and in reports has probably been taken without acknowledgment.[1]

*Rex* v. *Stewart*, 12 A. & E. 773, was an application for a mandamus to compel overseers, &c., to bury a person. The court:

---

[1] A copy of the old folio edition is in the library of Brown University, and of the enlarged 8vo edition is in the Athenæum. And see also tit. 17 C. Theod. de Sepulchris Viol. (9. 17.); also Jac. Gothofredus Comment. in loco.

" It should seem that the individual under whose roof a poor person dies is bound to carry the body decently covered to the place of burial ; he cannot keep him unburied, or do anything which prevents Christian burial ; he cannot therefore cast him out, so as to expose the body to violation, or to offend the feelings or endanger the health of the living; and for the same reason he cannot carry him uncovered to the grave." The mandamus was refused for other reasons.

The question is new in this state ; and we do not know that it has ever occurred in our mother country, and but seldom in the United States. That there is no right of property in a dead body, using the word in its ordinary sense, may well be admitted.[1]  Yet the burial of the dead is a subject which interests the

---

[1] By the old English law the body was not recognized as property, but the charge of it belonged exclusively to the church and the ecclesiastical courts (as did also administration of estates). The only common law remedy for a wrongful removal was by criminal process. In *Rex* v. *Sharpe*, Dearsly & B. 160; *S. C.* 40 Eng. Law & Eq. Rep. 581, a man was indicted for removing his mother's body from the burial ground of a dissenting church in order to bury it with his father's. Held, that although his motive was good, yet as he removed it without consent of the congregation or its officers, the indictment should be sustained. The court said that under the English law, the only protection of a grave, independent of ecclesiastical authority, was by indictment.

It was an offence at common law to remove a body. And it was a felony to steal the shroud or apparel. 3 Inst. 110, 202, 203 ; 12 Rep. 113 ; 1 Hale P. C. 515 ; 1 Russell Crim. Law, 414, n. A. ; 2 Term Rep. 733 ; American Cases: 13 Pick. 402 ; 10 Pick. 37 ; Ibid. 154 ; 19 Pick. 304 ; 1 Greenleaf, 226 (throwing body into river) ; Dane's Abridg. vol. 3, 13, 4, § 12, and vol. 7, 218, 2, 20 ; Chitty's General Practice, vol. 1, pp. 50, 95 n., 165, 793, 806.

And as to civil actions, an action of trespass would lie for defacing monument.   Co. Lit. 18, *b* ; 1 Chitty, 168 ; 3 Bingham, 136 ; 11 E. C. L. 69.

In the United States many cases have been decided as to the rights of vault owners in churches and churchyards. See *Price* v. *Meth. Ep. Church*, Hammond, Ohio, 515 ; *Dutch Church* v. *Mott*, 7 Paige, 77 ; *Corporation of Brick Presbyterian Church*, 3 Edwards Ch. 155 ; Ruggles's Report on Brick Church case, 4 Bradford's Surrogate, 503 ; *Windt* v. *German Reformed Church*, 4 Sandford Chanc. 471.

And the courts in England and in this country interfere by injunction to prevent removal.

In ancient, and even in modern times, it was the practice to arrest and detain dead bodies for debt.   See the Roman law; Burn's Ecc. Law, notes to pages before cited.   See also the Statutes of Rhode Island, Massachusetts, &c., forbidding it.

feelings of mankind to a much greater degree than many matters of actual property. There is a duty imposed by the universal feelings of mankind to be discharged by some one towards the dead ; a duty, and we may also say a right, to protect from violation ; and a duty on the part of others to abstain from violation ; it may therefore be considered as a sort of *quasi* property, and it would be discreditable to any system of law not to provide a remedy in such a case.

It is common to speak of the *right of burial*, of a person's *right* to be buried, &c. In the case *Rex* v. *Stewart*, before quoted, the court say : " Every person dying in this country . . . . *has a right* to Christian burial ; and that implies the right to be carried from the place where the body lies to the parish cemetery."

In *Gilbert* v. *Buzzard*, 1 Hagg. Con. 348, and *S. C.* 3 Phill. 335, Lord Stowell (Sir William Scott) says : ".The rule of law which says that a man has a right to be buried in his own churchyard is to be found most certainly in many of our authoritative text writers ; but it is not quite so easy to find the rule which gives him the right of burying a large chest or trunk in company with himself. That is no part of his original and absolute right, nor is it necessarily involved in it. That right, strictly taken, is to be returned to his parent earth for dissolution, and to be carried thither in a decent and inoffensive manner. When these purposes are answered, his rights are perhaps fully satisfied in the strict sense in which any claim in the nature of an absolute right can be deemed to extend." [1]  So Dr. Burn,

---

With us the executor or proposed administrator generally superintends the burial. Judge Redfield (on Wills, 2, 227, § 10) says it is the duty of the executor or *some one on behalf of the estate*, to see to the funeral rites. Williams (on Executors, 2, 829) expresses it that the excutor *must* bury the deceased. In *Hepgood* v. *Houghton*, 10 Pick. 154, the Supreme Court of Massachusetts held that the estate in the hands of the executor was bound for the expenses, and that the law raised an implied promise on the part of the executor or administrator to pay those who supplied the necessary expenses, so far as he had assets in his hands. Very much the same doctrine was held in *Cannpfield* v. *Ely*, 1 Green New Jersey Law, 150. By the Revised Statutes of Rhode Island, 1854, ch. 158, § 7, p. 370, funeral charges have the same preference. See 1 Hawks, 394, and 2 Dev. 21.

[1] The case of *Gilbert* v. *Buzzard* was a suit for refusal to bury the complainint's wife in an iron coffin. It was in some measure a dispute about the

quoting Gibson's Codex Juris. Ecclesiæ Anglicanæ, says: "Every parishioner hath and had always a *right* to be buried in" the parish burial ground.   1 Burn's Ecc. Law, 257.

Most people look forward to the proper disposition of their remains, and it is natural that they should feel an anxiety on the subject.   And the right of a person to provide by will for the disposition of his body has been generally recognized.   We have seen that by the canon law a person had a right to direct his place of sepulture.   Voet, *ante.*   Now, strictly speaking, according to the strict rules of the old common law, a dead man cannot be said to have rights.   Yet it is common so to speak, and the very fact of the common use of such language, and of its being used in such cases as we have quoted, justifies us in speaking of it as a right in a certain qualified sense, and a right which ought to be protected.   See 1 Chitty, General Practice, *50 note.   And a sort of right of custody over, or interest in the dead body, in the relatives of the deceased, is recognized in the statutes of many of our states.   The laws of Indiana, R. S. ch. 7, § 37, prohibit the removal of a dead body without the consent of the near relatives, or without the consent of the deceased, given in his lifetime.   See also *State* v. *Tate*, 6 Blackf. 111.   The laws of Louisiana and California recognize the interest of the relatives of the deceased in the body.   Tyler's Am. Ecc. Law, §§ 1128 and 1153.   So also the laws of Connecticut.   Laws of 1849, p. 250, § 137; Laws of Vermont, 1862, p. 129, tit. 11, ch. 18, § 8; Laws of Ohio, Swan's Revised Statutes, 1854, p. 294.   And see also the late English Statute of Burials, 15 & 16 Victoria, ch. 85, §§ 32 and 33; Baker's Laws relating to Burials.   See as to the various meanings of the word right, Austin's Province of Jurisp. vol. 1, § 6, p. 292.   See also Bill of Rights, § 5: "Every person ought to find a certain remedy for all injuries," &c.

---

amount of fees to be paid, it being contended that if iron coffins were used, the parish yard would soon be wholly occupied, so that it could not be used over again, and thus future burials there prevented.   The cemetery was not the property of one age only.   Evidence was taken to show the comparative length of time different woods and metals would endure.

In *King* v. *Coleridge*, 2 B. & Ald. 806; *S. C.* 1 Chitty, 588, which was substantially the same case as above, it was held that a mandamus might issue if burial was refused, but that the *mode* of burial was exclusively of ecclesiastical cognizance.

It has been the boast of many of the sages of the law that there is no wrong without a remedy. Says Lord Coke (Co. Lit. 197, *b*, 1 Thomas's Coke, 902) : " The law wills that in every case where a man is wronged and endangered he shall have a remedy." Lord Holt, in *Ashby* v. *White* : " If the plaintiff has a right, he must of necessity have a means to vindicate and maintain it." . . . . " It is a vain thing to imagine a right without a remedy." Lord Raymond, 938 ; *S. C.* 6 Modern, 45 ; Judgment of Lord Holt in *Ashby* v. *White*, *&c.*, reprinted, 1837 ; 1 Smith's Lead. Cases, *342. *356. And see Lord Abinger's interpretation of the old maxim, " Boni judicis est ampliare jurisdictionem." [1] And the late Ch. J. Ames has well expressed it in his opinion in the case of *Reynolds* v. *Hoxie*, 6 R. I. 463, 468, that it is perfectly understood that there cannot be a wrong under our jurisprudence for which the law does not in some form provide a remedy.

And in the Report upon the Codification of the Laws in Massachusetts, December, 1836, made by Joseph Story, Theron Metcalf, Simon Greenleaf, Luther S. Cushing, and C. E. Forbes, they say : —

" In truth, the common law is not in its nature and character an absolutely fixed, inflexible system, like the statute law, providing only for cases of a determinate form, which fall within the letter of the language, in which a particular doctrine or legal proposition is expressed. It is rather a system of elementary

---

[1] Lord Abinger, in *Russel* v. *Smith*, 9 M. & W. 818, says the maxim should be interpreted " to amplify the remedies of the law." Lord Mansfield, in *Rex* v. *Phillips*, 1 Burrow, 304 (quoted from Broom's Maxims), says the true reading is " ampliare *justitiam.*" Sir Joseph Jekyl, in *Bell* v. *Hyde* (Finch's Precedents, 329), said " it was a saying of a very great man, 'boni judicis est ampliare jurisdictionem;' and he thought to extend the arm of justice further than usual, when otherwise there would be a failure of justice, was the duty of every court."

The maxim was attributed to Lord Bacon, but is older than his time. He mentions it as a common saying. Aphorism 96, on Universal Justice, book 8 of De Augmentis, Spedding's ed. vol. 9, p. 341.

See also Code Napoleon, tit. prelim. § 4, discussed in Locre, Legislation de la France, vol. 1, 263, 376, 401, 417, 433, 480, 524, 556, 583, 601, 613 ; Code of Louisiana, Morgan's ed. 1853, tit. prelim. ch. 4, art. 21 ; Papers of the Juridical Society, vol. 1, 108, 416.

principles and of general juridical truths, which are continually expanding with the progress of society, and adapting themselves to the gradual changes of trade and commerce, and the mechanic arts, and the exigencies and usages of the country. There are certain fundamental maxims in it which are never departed from. There are others again which, though true in a general sense, are at the same time susceptible of modifications and exceptions, to prevent them from doing manifest wrong and injury.

"When a case, not affected by any statute, arises in any of our courts of justice, and the facts are established, the first question is, whether there is any clear and unequivocal principle of the common law, which directly and immediately governs it, and fixes the rights of the parties. If there be no such principle, the next question is, whether there is any principle of the common law, which, by analogy or parity of reasoning, ought to govern it. If neither of these sources furnishes a positive solution of the controversy, resort is next had (as in a case confessedly new) to the principles of natural justice, which constitute the basis of much of the common law; and if these principles can be ascertained to apply in a full and determinate manner to all the circumstances, they are adopted, and decide the rights of the parties. If all these sources fail, the case is treated as remediless at the common law, and the only relief which remains is by some new legislation by statute, to operate upon future cases of the like nature."

The very origin of equity in Rome and in England was that there was a wrong for which there was no remedy, or no adequate remedy at law. 1 Story's Eq. Jur. §§ 49 and 50. And we cannot but approve the language of Lord Cottenham in *Walworth* v. *Holt*, 4 Myl. & C. 619: "I think it the duty of this court to adapt its practice and course of proceeding to the existing state of society; and not by too strict an adherence to forms and rules established under different circumstances, to decline to administer justice and enforce rights for which there is no other remedy. . . . . If it were necessary to go much further than it is, in opposition to some highly sanctioned opinions, in order to open the door of justice in this court to those who cannot obtain it elsewhere, I should not shrink from the responsibility of doing so." Quoted in Story's Eq. Jur. Vol. 1, § 671, note.

In *Kurtz* v. *Beatty & Ritchie*, 2 Pet. 566, 584, which was to obtain an injunction to prevent the removal of tombs and graves, Judge Story, in giving the opinion of the United States Supreme Court, says: " It is a case where no action at law . . . . could afford an adequate and complete remedy. . . . . The remedy must be sought, if at all, in the protecting power of a court of chancery, — operating by its injunction to preserve the repose of the ashes of the dead and the religious sensibilities of the living."

In cases like the present no common law action could avail much. The owner of the lot might have trespass *quare clausum*, &c., but he could only recover damages in money. He might have an action of detinue for the body, or so much earth, &c., taken away ; or perhaps might have replevin ; if buried by permission on another's land, it might perhaps be considered a license or easement, for disturbance of which the person who procured the burial might have an action ; but it is easy to see that neither form of action affords a sufficient remedy, or could with any certainty restore the body to the proper custody.

Equity only can give a full and complete remedy, and we think the jurisdiction is fully adequate to it.

It seems the deceased Mr. Metcalf purchased a burial lot, and was, on his decease, with the consent of his widow, one of the respondents, and the complainants say they believe according to his own wishes, buried in it. The respondent, Mrs. Metcalf, has demurred to the bill, thus admitting these alleged facts, for the purposes of the present hearing. Taking these allegations as uncontradicted and true, as the body was removed by the widow, without the consent of the child, from a place where it was deposited by his own wishes and her consent, we think it should be restored to the place whence it came.

It is not necessary to decide at present what might have been done if the child had assented, or what the child might do of herself. And from the view we take of the case it is of less consequence to whom the custody is given.

Although, as we have said, the body is not property in the usually recognized sense of the word, yet we may consider it as a sort of *quasi* property, to which certain persons may have rights, as they have duties to perform towards it arising out of

our common humanity. But the person having charge of it cannot be considered as the owner of it in any sense whatever ; he holds it only as a sacred trust for the benefit of all who may from family or friendship have an interest in it, and we think that a court of equity may well regulate it as such, and change the custody if improperly managed. So in the case of custody of children, certain persons are *primâ facie* entitled to their custody, yet the court will interfere and regulate it. We think these analogies furnish a rule for such a case, and one which will probably do most complete justice, as the court could always interfere in case of improper conduct, *e. g.* preventing other relatives from visiting the place for the purpose of indulgence of feeling, or testifying their respect or affection for the deceased.

The complainants further charge that after the body had been surreptitiously disinterred by Mrs. Metcalf, and had been surreptitiously removed by her to the newly prepared grave, the superintendent of the defendant corporation, upon his attention being then for the first time called to the matter while the body was thus exposed, did not direct its immediate reinterment in the lot from which it had been taken, but permitted and allowed it to be interred in the new grave which Mrs. Metcalf had had prepared for it in the lot to which it had been removed ; and therefore pray that said corporation may be directed to restore the remains to the lot from which they were removed, and that said Mrs. Metcalf be enjoined from interfering therewith. The defendant cemetery corporation has answered admitting the statements of the bill, and while denying the jurisdiction of the court to direct or control the management of the internal affairs of the corporation, submitting to execute or permit to be executed such decree as the court may make in the premises.

Consent of course cannot give jurisdiction. But we think there is no doubt of the jurisdiction of the court in this case. This corporation holds these lands for certain purposes, and for those only. They have no doubt a certain control over the property, but that control is to be exercised in such manner as to carry out, at least not to interfere with, the legal rights of those who hold burial lots under them. They are in fact trustees for certain purposes, and when the trust is not properly executed,

this court has the same jurisdiction to compel its execution as in case of any other trust.

The demurrer of Mrs. Metcalf, the respondent, is overruled. She can answer and contest the allegations of the bill if she chooses to do so.                    *Demurrer overruled.*