In the Matter of the Estate of MARGARET K. JOHNSON, Deceased.

Surrogate's Court, New York County, September 12, 1938.

*Helen Carey Johnson*, petitioner in person.

DELEHANTY, S. In the petition for probate filed in this estate the petitioner cites the parties in interest "to show cause why the last will and testament herewith presented and hereby offered for probate should not be admitted to probate." With the petition petitioner presents two separate papers. The first of these is a printed form of will such as is commonly sold by law stationers. The proof shows that deceased used this form for the due execution of a will containing only one dispositive paragraph and a paragraph appointing executors. The printed form is a continuous sheet equivalent to two sheets of legal-cap size. Beginning at the end of certain printed text in the upper part of the face of the first sheet there was originally a long blank space which continued down to the lower part of the third page of the blank. On the first page the dispositive words of the will were written in pen and ink in the appropriate space. On the third page (the face of the second full sheet of the blank) the names of the executors were written in an appropriate place. The name of the testatrix was written in a blank space on the first page and the date of execution in blank spaces on the third page. The testatrix and the witnesses signed at the end of the will. Thus the original will was completely executed in sufficient compliance with the statute. Finally a notary public certified that the instrument had been subscribed and sworn to before him.

Occupying a part of the originally blank space above the clause on the third page appointing the executors there is now a type-written statement which is headed " codicil." The proof shows that this was typed in after the will had been duly executed. This addendum was signed by deceased and was witnessed by the witnesses who had subscribed the will. The formalities employed were a sufficient compliance with section 21 of Decedent Estate Law. Apart from the will form which thus contains two pur-ported instruments there was presented with the petition a third and undated instrument. It is in all substantial respects the same as the text of the " codicil " typed in the body of the will. It says: " I, Margaret K. Johnson (wife of Merle De Vore Johnson) being of sound mind and in full possession of my senses, and for no thought of remuneration but purely out of the largeness of my heart and a keen desire to help, if possible, the cause of Science, do hereby bequeath my body for the purposes of medical research. Such Research is to be conducted under the direction, either jointly or singly, of James A. Corscaden, M. D. and Hugh Auchincloss, M. D., at present both of the City of New York and the Hark-ness Pavilion. It is my wish that my body be cremated in the simplest form and without grass."

Probate courts do not exclude from an admitted instrument matter which is itself not dispositive provided the instrument otherwise contains dispositive provisions or provides for the appointment of an executor. The views of testators on mundane and celestial affairs (so long as not libelous or scandalous) are ordinarily recorded as part of the testamentary instrument. The courts decline, however, to probate instruments which contain neither dispositive provisions nor executorial appointment. The question presented by this petition and by the tender of the instru-ments now before the court is whether a paper purporting to dispose of a dead body only is a *testamentary* instrument and hence entitled to probate.

Article 198 of the Penal Law deals with sepulture and defines various offenses in relation to funerals and resting places of the dead and to the disturbance or misuse of dead bodies. The intro-ductory section of that article (Penal Law, § 2210) provides: " Right to direct disposal of one's own body after death. A person has the right to direct the manner in which his body shall be dis-posed of after his death; and also to direct the manner in which any part of his body, which becomes separated therefrom during his lifetime, shall be disposed of; and the provisions of this article do not apply to any case where a person has given directions for the disposal of his body or any part thereof inconsistent with those provisions."

This text imports no special formality in the directions to be given. It would seem that whether directions pursuant to this statute had been given would be a question of fact to be determined under the ordinary rules of evidence and that parol or nonformal dispositions, if proved, would be equally valid under this section as directions given by formal instruments. This section of the Penal Law, therefore, gives no aid in the solution of the question whether such a direction in testamentary form is entitled to probate as a dispositive act.

It has been doubted by grave and weighty authority whether there is any property in a corpse. Lord COKE formulated the common-law doctrine on this point and incidentally supplied a whimsical derivation for the word " cadaver." He said: " It is to be observed, that in every sepulchre, that hath a monument, two things are to be considered, viz. the monument, and the sepulture or buriall of the dead. The buriall of the *cadaver* (that is *Caro data vermibus*) is *nullius in bonis,* and belongs to ecclesiastical cognisance, but as to the monument, action is given (as hath been said) · at the common law for defacing thereof " (Coke's Inst. [3d part] p. 203.) Both Lord COKE's assertion that the word cadaver is a combination of the first syllables of the words in the Latin phrase " Caro data vermibus " (flesh given to worms) and his declaration that " the buriall * * * is *nullius in bonis* " were severely criticized in an oft-cited opinion written in 1856 by Hon. Samuel B. Ruggles while acting as referee in connection with the widening of Beekman street in this city (4 Bradf. 503, appendix). Many of the subsequent discussions by courts and text writers concerning the law of dead bodies will be found to contain most respectful references to this opinion. But there has been at least one vigorous dissent from the common estimate of the Ruggles views. Mr. R. S. Guernsey writing on " The ownership of a corpse before burial " (10 Cent. L. J. 303, 304), remarks that Mr. Ruggles' opinion " is full of errors of law and of fact, and will mislead those who look no further into the subject." Without considering the merits of Mr. Ruggles' views in their entirety it seems safe to say that old and new lexicographers support Mr. Ruggles and Vossius whom he cites (4 Bradf. 520) and establish that a corpse is called a cadaver — " *quia stare non potest* "— because it is unable to stand. The root is found in the Latin " cadere "— to fall.

Mr. Ruggles (p. 521) says respecting COKE's comment on property in a corpse: " But even the dictum itself, if closely examined, will not be found to assert, that no individual can have any legal interest in a corpse. It does not at all assert that the corpse, but only that the ' buriall ' is ' nullius in bonis '; and this assertion

was legally true in England, where it was made, * * * (because) the temporal office of burial had been brought within the exclusive legal cognizance of the church." Here Mr. Ruggles seems to be on unsafe ground. His comment is not an accurate statement of what Coke said. If the advice of Mr. Ruggles is taken and the statement of Lord Coke *is* " closely examined " it will be seen that the latter said " the burial of the cadaver is *of nothing* from the standpoint of property " (*nullius* is genitive). Lord Coke has simply asserted the proposition, without supplying any explanation at this place for his view, that a body is in a property sense nothing whatsoever. Coke does not say the *burial* is nothing but the burial is *of* nothing. Mr. Ruggles' assertion that property was denied to reside in a corpse *because* the burial was within ecclesiastical cognizance implies the absurd view that the ecclesiastical jurisdiction extended only to non-property questions — an idea without any basis.

It is perhaps impossible to know with certainty how the conception arose in the common law that a corpse is not and cannot be property. It will be remembered that in the natural science of Coke's day (he died in 1634) there was a very limited understanding of the physical structure of the body. The prevalent conception of the seventeenth century was that which still obtains and no doubt will continue to endure among men of religious faith. Coke himself expressed this conception, where he said: " Concerning the building or erecting of tombs * * * it is lawfull, for it is the last work of charity that can be done for the deceased, *who whiles he lived was a lively temple of the Holy Ghost, with a reverend regard, and Christian hope of a joyfull resurrection.*" (Italics supplied.) (Coke's Inst. [3d part] p. 201.) In speaking thus of the resurrection of the body, Coke had restated the aspirations of Job who said: " And though after my skin worms destroy this body, yet *in my flesh* shall I see God " (Job 19:26).

There is thus expressed by Coke a conception of the human body which was most congenial to the human mind in the seventeenth century. The body was the temple of the Holy Ghost from which at his death a man was temporarily to be separated. That this sacred object should be property was unthinkable to Lord Coke and to his contemporaries. The body in a commercial sense was devoid of market value. A son could not then have hypothecated the body of his father to secure money borrowed by the former as he might have done in ancient Egypt nor could execution be sued out by a creditor against the dead body of his debtor. A man had a right to the decent interment of his own body in expectation of the day of resurrection.

A cursory examination of the libers of wills probated in New York county in the seventeenth and eighteenth centuries proves that testators claimed the right to control the place and manner of the burial of their bodies. Giles Hudson, a London merchant, made a will which was probated here in 1783. In it he directed that his " body be laid in [his] own vault in Chiswick in the county of Middlesex. (Liber 36, p. 260.) The will of Lewis DuBois, probated in 1711, follows a formula which is found running continuously throughout the wills probated from at least 1666 to 1744. (See liber 1–2, p. 12; liber 7, p. 217; liber 17, p. 347.) The will of Mr. DuBois says: " In the Name of God Amen The Eight day of July in the year of our Lord 1711 I Lewis Du Bois of Statnise Land in the County of Richmond and Province of New York Blacksmith being in good health and perfect mind and memory thanks be given unto God therefore calling unto mind the Mortality of my body and knowing that it is appointed for all Men once to die do make and ordain this my last will and testament that is to say principally and first of all I give and recommend my soul into the hands of God that gave it and for my Body I recommend it to the Earth to be buried in a Christian like and decent manner at the discretion of my executor *nothing doubting but at the General Resurrection I shall receive the same again by the mighty power of God* and as Touching all such worldly estate wherewith it hath pleased God to bless me in this life." (Italics supplied.) This quaint and pious formula is rich in theological and legal implications. The body is carefully discriminated from the " worldly estate " or property of the deceased. It was to return to earth but not to be wholly lost. The deceased from his belief in the resurrection necessarily inferred that he surrendered his body to an earth deemed to be not so much a donee as a bailee.

Various instances of testamentary directions disposing of the body have been collected by writers on the subject. " Becker (Wilhelm A.) * * * cites the provision (in Charicles, pp. 390–1) of the will of Lycon [an ancient Greek] that his body should be burnt; the first known instance of testamentary disposition of the corpse." (19 Am. L. Rev. 251, 256.) Frank W. Grinnell of the Massachusetts bar said in his article on " Legal Rights in the Remains of the Dead," published in the *Green Bag* for June, 1905 (p. 345): " The following are instances of this practice: Jeremy Bentham, whose learning and research in the law gives his example peculiar weight, bequeathed his body for dissection. William Pelham, Kt., in 1532, bequeathed his body ' to be buried in the Chauncel of Laughton.' John of Gaunt, in 1397, directed his body to be buried in the cathedral church of St. Paul, ' and that it be not buried for forty days during which I charge my executors that there be no cering or embalming of my corpse.' "

There was an outpouring in the nineteenth century of court decisions on the question of whether there is any property in a corpse. This was the outcome mainly of three distinct and unrelated causes. As a result of loosened family ties it sometimes happened that a man's widow and " next of kin " contested for the control of the deceased's body for purposes of burial. The courts were obliged to consider whether there are rights in or to a corpse and whether a corpse is in any sense property. The rise of medical schools, the increase in the number of doctors and the recognition in medical circles of the need for knowledge of the human body based on the art of dissection resulted in unauthorized autopsies, and body-snatching from graveyards. (Parenthetically it may be noted that this factor in one celebrated instance occasioned the development of a business in homicide carried on by two enterprising murderers named Burke and Hare who, obeying the law of supply and demand, provided eager doctors with what they greatly needed but could not legally obtain in sufficient quantity. It was thus that the verb " to burke "— meaning to kill by suffocation — entered our language.) Unauthorized dissections of dead bodies resulted in suits for damages by aggrieved next of kin and the courts were obliged to determine whether there was property in a dead body. Lastly, interment ceased gradually to be the universal method for disposing of the dead. When testators directed cremation of their remains some of their next of kin, out of religious or other considerations, challenged the right in the deceased to direct that such disposition should be made of his corpse.

For these reasons a considerable body of case law developed. The majority of the courts plainly held that a testator might use his will to give binding directions respecting the disposition of his remains. The minority were of a different opinion and their views are principally to be found in *Williams* v. *Williams* (L. R. 20 Ch. Div. 659) and *Enos* v. *Snyder* (131 Cal. 68; 63 P. 170). In the *Williams* case deceased by his fourth codicil directed that his body should be given to a named person " to be dealt with by her in such manner as he had directed to be done in a private letter to her." The court, after citing *Reg.* v. *Sharpe* (Dea. & Bell C. C. 160) for the proposition that there is no property in a corpse, and Blackstone on the duty of an executor to bury his testator, held (p. 665): " It follows that a man cannot by will dispose of his dead body. If there be no property in a dead body it is impossible that by will or any other instrument that body can be disposed of."

A similar determination was reached in *Enos* v. *Snyder* (*supra*). There deceased had separated from his wife and daughter and was residing with the defendant. He left a will which contained

a direction that the manner, time and place of his burial should be according to the wishes and directions of Mrs. Snyder, the defendant. The wife and daughter sued Mrs. Snyder and also the executor of deceased for possession of the body and the court — largely on a basis of *Williams* v. *Williams* (*supra*) — said (p. 69): " It is quite well established * * * that, in the absence of statutory provisions, there is no property in a dead body, that it is not part of the estate of the deceased person, and that a man cannot by will dispose of that which after his death will be his corpse." In reaching this conclusion the California court declined to accept its own prior opinion in *O'Donnell* v. *Slack* (123 Cal. 285, 288; 55 P. 906) where it said that an " individual has a sufficient proprietary interest in his own body after his death to be able to make valid and binding testamentary disposition of it."

Both the *Williams* and *Enos* cases are aptly dealt with in *Pettigrew* v. *Pettigrew* (207 Penn. St. 313, 317; 56 A. 878), where the court, after holding that the law " recognizes property in a corpse, but property subject to a trust," said: " In *Williams* v. *Williams*, L. R. 20 Ch. Div. 659, KAY, J., held that the right of custody being incident to the duty of burial which is in the executors, a man in England, ' cannot by will dispose of his dead body.' * * * The case grew out of the disinterment and cremation of the body by a stranger to the family * * * and with great respect for the tribunal I cannot help thinking that the decision was unconsciously influenced by the English conservatism in regard to burial, and the attendant reluctance to countenance in anyway the innovation of burning. The clear trend, I think, of the American decisions, is to the contrary notwithstanding * * * *Enos* v. *Snyder* * * * where the cases cited do not support the dictum."

This Pennsylvania decision correctly states the actual drift of American decisions and also illustrates the tendency of the courts to justify their results by questioning the dictum of COKE that a corpse is nothing from the standpoint of property. The Pennsylvania court's assertion that the body is " property subject to a trust " may be compared with the holding in *Pierce* v. *Proprietors of Swan Point Cemetery* (10 R. I. 227, 238) that a dead body may be considered " as a sort of *quasi* property;" with the determination in *Larson* v. *Chase* (47 Minn. 307; 50 N. W. 238) that to a person with a right to the possession of a corpse it " is his property in the broadest and most general sense of that term; " and finally with the conclusion stated in *Bogert* v. *City of Indianapolis* (13 Ind. 134, 138; 41 N. E. 396) that " we lay down the proposition, that the bodies of the dead belong to the surviving relations, in the order of inheritance, as property." (This last view is in " characteristic disregard for precedent." See 19 Am. L. Rev. 251, 264.)

The failure of the courts to come to definitive agreement respecting the right to make testamentary disposition of one's body is curiously reflected by the text writers. A correct summary statement of the law is to be found at 40 Cyc. 1050. That a gift by a testator of his corpse is inoperative is the conclusion reached in 1 Page on Wills ([2d ed.], § 197) and 1 Alexander's Commentaries on Wills (p. 414, § 316). And in Thompson on Wills ([2d ed.], pp. 64, 640) it appears at section 39 that the author finds the rule to be that a person cannot make testamentary disposition of his own body, but at section 561 — after pointing out the unsatisfactory state of the law on the subject — this author says that " the weight of authority in this country holds that a testator has a right to direct the manner in which his body shall be disposed of after death, and his directions in this respect generally have been given effect."

In New York it has been stated that there is no property in a corpse. (*Snyder* v. *Snyder*, 60 How. Pr. 368, 371; *Secord* v. *Secor*, 18 Abb. N. C. 78, 80.) In the latter case the court writing of the Indiana doctrine mentioned above said that this viewpoint is " sustained neither by adjudication elsewhere, nor by principle that will find favor in our courts." On the other hand, the case of *Larson* v. *Chase* (*supra*), in which a corpse is said to be property within the broadest meaning of that term, has been cited with approval by the Court of Appeals in *Darcy* v. *Presbyterian Hospital* (202 N. Y. 259, 263; reargument denied, 203 id. 547). The court in the cited case also said (p. 262): " The most elaborate consideration of the question in the courts of this country appears in the case of *Larson* v. *Chase* (47 Minn. 307), in which, after an examination of the authorities both in this country and in England, the conclusion is reached that while no action can be maintained by the executor or administrator upon the theory of any property right (in a commercial sense) in a decedent's body, the right to the possession of a dead body for the purpose of preservation and burial belongs to the surviving husband or wife or next of kin, *in the absence of any testamentary disposition.*" (Italics supplied.)

This passage implies that the Court of Appeals is prepared to rule that when a testator disposes of his body by will his directions will be deemed to concern proper subject-matter for such an instrument. This result has actually been reached in one New York case. In *Cooney* v. *English* (86 Misc. 292) action was brought by an executor to recover the remains of his testator, then interred in this State, for removal and reinterment in Pennsylvania. The action was opposed by deceased's son who in ignorance of the provisions of the will had caused the remains of his father to be here

interred. The court said (p. 294): " In the case at bar the will contains an express direction as to the place of interment * * * and neither the executor nor the court is at liberty to disregard it. It is, of course, true that the remains of a deceased person should not be removed from the place of sepulture for light reasons. But compliance with the testator's positive direction is not, in my judgment, a light reason, but a controlling one." (See, also, *Foley* v. *Phelps*, 1 App. Div. 551; *Birch* v. *Birch*, 123 Misc. 229; *Matter of Wong Yung Quy*, 2 Fed. 624; Perley on Mortuary Law, p. 24.)

It is pertinent here to refer to the Roman civil law which furnishes much of the whole body of probate law of this State. In *Matter of Van Ness* (78 Misc. 592, 600, 601) Surrogate FOWLER said:

" I have cited the Roman law as still of some indirect influence on probate law and the law of wills, and in so doing I am justified by precedent. In this court the authorized citations of rules of law differ from those employed in the other courts of this State. The testamentary law, administered in this court, stands on its own independent foundations and it has a long history, too little understood. The genesis of the English and American will was peculiarly Roman, and in every country where wills exist Roman law affecting them remains potentially, even if not expressly, adopted. * * *

" The influence of Roman or civil law * * * is necessarily to be recognized in probate jurisdictions. * * * When the Constitution of this State adopted the former law in force in New York, the civil and canon law, then recognized in the Ecclesiastical Courts of England and the Prerogative Courts of New York, became a part of the fundamental law of this State, and so it continues in this court, in the absence of more direct authority to the contrary, to prescribe the *ratio decidendi* for probate cases not otherwise provided for by statute or domestic adjudications of authority." (Citing numerous authorities.)

In the Pandects (Book 11, tit. 7, § 12, subd. 4) the text says: " *Funus autem eum facere oportet quem decedens elegit. Sed si non ille fecit, nullam esse hujus rei poenam; nisi aliquid pro hoc emolumentum ei relictum est: tunc enim si non paruerit voluntati defuncti, ab hoc repellitur.*" (5 Pothier's ed., Paris, 1818–1823, 218.) In Scott's translation (4 The Civil Law, 90) he construes this text to mean: " He whom the deceased selected must conduct the funeral, but if he should not do so he will be liable to no penalty, unless something of value was left to him for this purpose; for then, if he does not comply with the will of the deceased, he will be excluded from the bequest."

Thus we find in the Roman law express recognition of the right of a deceased by testament to direct his burial and to nominate the person to take charge of it. The testament of this deceased, therefore, follows a pattern of the ancient Roman law. Historically she has performed an act of testamentation giving directions respecting her body. Since the directions contravene no statute and are consistent with the proprieties there is no reason why the directions may not be given effect. Specifically there is no reason why the instrument may not be probated as a means of giving effect to her wishes.

Accordingly the court has signed a decree establishing as the will of deceased the partly printed and partly manuscript instrument plus the typewritten codicil later embodied in the blank space of that instrument and plus the separate instrument dealing exclusively with deceased's body.