786

Robert NEWMAN, as father and next of kin of Richard A. Newman and Barbara Obarski as mother and next of kin of Kenneth S. Obarski, individually and on behalf of all other similarly situated individuals, Plaintiffs–Appellants,

v.

L. SATHYAVAGLSWARAN, M.D., in his official capacity as Chief Medical Examiner–Coroner of the County of Los Angeles; Anthony T. Hernandez, in his official capacity; County of Los Angeles, Department of the Coroner, Defendants–Appellees.

No. 00–55504.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 17, 2001.

Filed April 16, 2002.

Bill Colovos, Southgate, MI, for the plaintiffs-appellants.

Cheryl A. Orr, Musick, Peeler & Garrett LLP, Los Angeles, California; Aaron M. Peck, Arter & Hadden LLP, Los Angeles, CA, for the defendants-appellees.

Before: BROWNING, FERNANDEZ and FISHER, Circuit Judges.

FISHER, Circuit Judge.

Parents, whose deceased children's corneas were removed by the Los Angeles County Coroner's office without notice or consent, brought this 42 U.S.C. § 1983 action alleging a taking of their property without due process of law. The complaint was dismissed by the district court for a failure to state a claim upon which relief could be granted. We must decide whether the longstanding recognition in the law of California, paralleled by our national common law, that next of kin have the exclusive right to possess the bodies of their deceased family members creates a property interest, the deprivation of which must be accorded due process of law under the Fourteenth Amendment of the United States Constitution. We hold that it does. The parents were not required to exhaust post deprivation procedures prior to bringing this suit. Thus, we hold that they properly stated a claim under § 1983.

## I. FACTUAL AND PROCEDURAL BACKGROUND

■ In reviewing the district court's dismissal of the complaint under Rule 12(b)(6), "we must 'take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party.'" *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1196 (9th Cir.1998) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957 (9th Cir.1996)). Robert Newman and Barbara Obarski (the parents) each had children, Richard Newman and Kenneth Obarski respectively, who died in Los Angeles County in October 1997. Following their deaths, the Office of the Coroner for the County of Los Angeles (the coroner) obtained possession of the bodies of the children and, under procedures adopted pursuant to California Government Code § 27491.47 as it then existed,[1] removed the corneas from those bodies without the knowledge of the parents and without an attempt to notify them and request consent. The parents became aware of the coroner's actions in September 1999 and subsequently filed this § 1983 action alleging a deprivation of their property without due process of law in violation of the Fourteenth Amendment.[2]

---

**1.** California Government Code § 27491.47(a) stated:

Notwithstanding any other provision of law, the coroner may, in the course of an autopsy, remove and release or authorize the removal and release of corneal eye tissue from a body within the coroner's custody, if ... [t]he coroner has no knowledge of objection to the removal....

**2.** 42 U.S.C. § 1983 states, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

The coroner filed a Rule 12(b)(6) motion to dismiss, arguing that the parents could not have a property interest in their deceased children's corneas. The coroner also argued that to the extent the parents did have due process rights, they were required to exhaust state post-deprivation remedies prior to bringing suit. The district court granted the motion to dismiss prior to a scheduled hearing and without a written opinion explaining the basis for the dismissal. We review de novo, *Schneider*, 151 F.3d at 1196, to assess whether "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle[them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## II. PROPERTY INTERESTS IN DEAD BODIES

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. At the threshold, a claim under § 1983 for an unconstitutional deprivation of property must show (1) a deprivation (2) of property (3) under color of state law. *See Parratt v. Taylor*, 451 U.S. 527, 536–37, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). If these elements are met, the question becomes whether the state afforded constitutionally adequate process for the deprivation. *Id.* at 537, 101 S.Ct. 1908. Here, it is uncontested that the coroner's action was a deprivation under color of state law. The coroner argues, however, that the dismissal of the parents' complaint was proper because they could not have a property interest in their children's corneas.

Since *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court repeatedly has affirmed that "the right of every individual to the possession and control of his own person, free from all restraint or interference of others," *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), is "so rooted in the traditions and conscience of our people," *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled in part, Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), as to be ranked as one of the fundamental liberties protected by the "substantive" component of the Due Process Clause. *See Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) ("The integrity of an individual's person is a cherished value of our society."); *Rochin*, 342 U.S. at 174, 72 S.Ct. 205 (describing unauthorized physical invasions of the body as "offensive to human dignity"). This liberty, the Court has "strongly suggested," extends to the personal decisions about "how to best protect dignity and independence at the end of life." *Washington v. Glucksberg*, 521 U.S. 702, 716, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 302, 305, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (Brennan, J. dissenting) (expressing the view that a right "to choose to die with dignity" flows from "[t]he right ... to determine what shall be done with one's own body, [which] *is* deeply rooted in this Nation's traditions ... and is securely grounded in the earliest common law"). The Court has not had occasion to address whether the rights of possession and control of one's own body, the most "sacred" and "carefully guarded" of all rights in the common law, *Botsford*, 141 U.S. at 251, 11 S.Ct. 1000, are property interests protected by the Due Process Clause. Nor has it addressed what Due Process protections are applicable to the

rights of next of kin to possess and control the bodies of their deceased relatives.

 "[T]he property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).[3] "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired[.]" *Id.* at 576, 92 S.Ct. 2701.[4] These property interests "are not created by the Constitution[,] ... they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state˙ law[.]" *Id.* at 577, 92 S.Ct. 2701. Thus, the first step of our analysis is to analyze the history of rules and understandings of our nation with respect to the possession and protection of the bodies of the dead.

## A. History of Common Law Interests in Dead Bodies

Duties to protect the dignity of the human body after its death are deeply rooted in our nation's history. In a valuable history of the subject, the Supreme Court of Rhode Island recounted:

> By the civil law of ancient Rome, the charge of burial was first upon the person to whom it was delegated by the deceased; second, upon the *scripti haeredes* (to whom the property was given), and if none, then upon the *haeredes legitimi* or *cognati* in order.... The heirs might be compelled to comply with the provisions of the will in regard to burial. And the Pontifical College had the power of providing for the burial of those who had no place of burial in their own right.

*Pierce v. Proprietors of Swan Point Cemetery,* 10 R.I. 227, 235–36, 1872 WL 3575 (1872) (citations omitted).

In 17th century England, and in much of Europe, duties to bury the dead and protect the dignified disposition of the body, described as flowing from a *"right of burial, ... a person's right to be buried,"* *id.* at 238–39; *accord In re Johnsons's Estate,* 169 Misc. 215, 7 N.Y.S.2d 81, 84 (N.Y.Surr.Ct.1938) (explaining that in 17th century England, "[a] man had a right to the decent interment of his own body in expectation of the day of resurrection"),[5]

---

**3.** *See* Morton J. Horwitz, *The Transformation of American Law: 1870–1960* 145 (1992) (describing the transformation of the concept of property after the Civil War away from "the prevailing emphasis in traditional law ... on a 'physicalist' definition of property derived from land").

**4.** *See* Arthur Linton Corbin, *Taxation of Seats on the Stock Exchange,* 31 Yale L.J. 429, 429 (1922) ("Our concept of property has shifted.... '[P]roperty' has ceased to describe any res, or object of sense, at all, and has become merely a bundle of legal relations—rights, powers, privileges, immunities.")

**5.** The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as "jural correlatives"—different aspects of the same legal relation. *See* Wesley Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning,* 23 Yale L.J. 16 (1913); *see also* Joseph William Singer, *The Legal Rights Debate in Analytical Jurisprudence from Bentham to Hohfeld,* 1982 Wis. L.Rev. 975; Arthur Corbin, *Jural Relations and Their Classfication,* 30 Yale L.J. 226 (1921). Oliver Wendell Holmes described rights as "intellectual constructs used to describe the consequences of legal obligations. As he puts it [in *The Common Law* (1881)], 'legal duties are logically antecedent to legal rights.'" Horowitz, *supra* at 138. Holmes' description appears particularly apt in respect to the law regarding dead bodies where duties to provide burial were recognized as flowing from a right of the dead, even though "strictly speaking, ... a dead man cannot be said to have rights." *Pierce,* 10 R.I. at 239.

were borne primarily by churches, which had a duty to bury the bodies of those residing in their parishes. *Pierce*, 10 R.I. at 236. These duties, and the explanation of their genesis in the rights of the dead, carried over into New England colonial practice where "[i]n many parts ... the parish system prevailed, and every family was considered to have a right of burial in the churchyard of the parish in which they lived." *Id.* at 235.

The Roman practice of including duties to protect the body of the dead in civil law had no parallel in the early English common law because burials were matters of ecclesiastical cognizance. *Id.* Thus, Blackstone explained that "though the heir has a property [interest] in the monuments and escutcheons of his ancestors, yet he has none in their bodies or ashes; nor can he bring any suit or action against such as indecently, at least, if not injuriously, violate and disturb their remains, when dead and buried." *Bessemer Land & Improvement Co. v. Jenkins*, 111 Ala. 135, 18 So. 565, 567 (1895) (quoting 1 Bl. Comm. 429); *see also In re Johnson's Estate*, 7 N.Y.S.2d at 83 (discussing Lord Coke's assertion that "buriall of the cadaver ... is nullius in bonis, and belongs to ecclesiastical cognisance").

A change in the common law in England can be traced to the 1840 case of *Rex v. Stewart*, 12 AD. & E. 773 (1840). In that case, the socially recognized right of the dead to a dignified disposition, previously enforced only through ecclesiastical courts, was interpreted as creating enforceable common law duties. The question before the court was whether the hospital in which "a pauper" died or the parish in which she was to be buried was under a duty to carry the body to the grave. *Id.* at 774. The court expressed "extreme difficulty in placing ... any legal foundation" for either rule, but stated it was unwilling

to discharge the case "considering how long the practice had prevailed, and been sanctioned, of burying such persons at the expense of the parish, and the general consequences of holding that such practice ha[d] no warrant in law." *Id.* at 776–77. It stated the premises that, under long-standing tradition, "[e]very person ... has a right to Christian burial ... that implies the right to be carried from the place where his body lies to the parish cemetery" and "bodies ... carried in a state of naked exposure to the grave [ ] would be a real offence to the living, as well as an apparent indignity to the dead." *Id.* at 777–78. From these traditional understandings, the court concluded that "[t]he feelings and interests of the living require" that "the common law cast [ ] on some one the duty of carrying to the grave, decently covered, the dead body of any person dying in such a state of indigence as to leave no funds for that purpose." *Id.* at 778. That duty, it held, was imposed on "the individual under whose roof a poor person dies ...: he cannot keep him unburied, nor do any thing which prevents Christian burial: he cannot therefore cast him out, so as to expose the body to violation, or to offend the feelings or endanger the health of the living: and for the same reason, he cannot carry him uncovered to the grave." *Id.* at 778–79.

Many early American courts adopted Blackstone's description of the common law, holding that "a dead body is not the subject of property right." *Bessemer Land*, 18 So. at 567. The duty to protect the body by providing a burial was often described as flowing from the "universal ... right of sepulture," rather than from a concept of property law. *Wynkoop v. Wynkoop*, 42 Pa. 293, 300–01, 1861 WL 5846 (1862). As cases involving unauthorized mutilation and disposition of bodies increased toward the end of the 19th century, paralleling the rise in demand for

human cadavers in medical science and use of cremation as an alternative to burial, *see In re Johnson's Estate*, 7 N.Y.S.2d at 85–86 (describing "an outpouring" of such cases), courts began to recognize an exclusive right of the next of kin to possess and control the disposition of the bodies of their dead relatives, the violation of which was actionable at law. Thus, in holding that a city council could not "seize upon existing private burial grounds, make them public, and exclude the proprietors from their management," the Supreme Court of Indiana commented that "the burial of the dead can [not] ... be taken out of the hands of the relatives thereof" because "we lay down the proposition, that the bodies of the dead belong to the surviving relations, in the order of inheritance, as property, and that they have the right to dispose of them as such, within restrictions analogous to those by which the disposition of other property may be regulated." *Bogert v. City of Indianapolis*, 13 Ind. 134, 136, 138 (1859).[6] Over a decade later, the Rhode Island Supreme Court relations ... as property to a report by the Honorable Samuel B. Ruggles, described the nation's common law as bestowing upon next of kin "a duty [towards the dead], and we may also say a right, to protect from violation; and a duty on the part of others to abstain from violation"; a dead body "may there-

fore be considered as a sort of *quasi* property." *Pierce*, 10 R.I. at 238.

### B. Interests in Dead Bodies in California Law

In 1872, the same year *Pierce* was decided, California enacted Penal Code § 292, imposing a legal duty on next of kin to bury the deceased. *See* Cal.Penal Code § 292 (West 2002), Historical and Statutory Notes. In 1899, the California Supreme Court held that duty required recognition of exclusive rights of possession, control and disposition vesting in those with the duty. *O'Donnell v. Slack*, 123 Cal. 285, 55 P. 906, 907 (1899). These rights, it explained, were by law "protected, and for a violation of which [next of kin] are entitled to indemnification." *Id.*

At issue in *O'Donnel* was a probate court's order that a third party "stranger in blood" be charged with removing O'Donnel's body to his desired grave in Ireland. His wife, who was too sick to move the body immediately, objected that only she had the right to accompany the body and refused to consent to anyone else being given that charge. Relying heavily on the reasoning of *Pierce*, the California Supreme Court explained:

The duty of the burial of the dead is made an express legal obligation [by

---

**6.** *Bogert* attributed the rule that dead bodies "belong to the surviving relations ... as property" to a report by the Honorable Samuel B. Ruggles, special master to the State Supreme Court of New York, 4 Bradford's Surrogate 503, 503–532 (1856). Ruggles was appointed to analyze the legal implications of relocating some graves to complete the widening of Beekman street. He "submitted the following conclusion[s], as justly deducible from the fact, that no ecclesiastical element existed in the jurisprudence of the state of New York":

1. That neither a corpse, nor its burial, is legally subject, in any way, to ecclesiastical cognizance, nor to sacerdotal power of any kind.

2. That the right to bury a corpse and to preserve its remains, is a legal right, which the Courts of law will recognize and protect.

3. That such right, in the absence of any testamentary disposition, belongs exclusively to the next of kin.

4. That the right to protect the remains, includes the right to preserve them by separate burial, to select the place of sepulture, and to change it at pleasure.

5. That if the place of burial be taken for public use, the next of kin may claim to be indemnified for the expense of removing and suitably reinterring their remains.

*Bogert*, 13 Ind. at 140 n. 1.

Penal Code § 292]; but aside from the obligation, there is a right, well defined and universally recognized, that in disposing of the body of deceased the last sad offices belong of right to the next of kin.... This right had its origin in sentiment, in affection for the dead, in religious belief in some form of future life. It therefore early became a subject of cognizance by the ecclesiastical courts. But, while thus having its origin in affection and religious sentiment, it soon came to be recognized as a strictly legal right; and the next of kin, while not, in the full proprietary sense, 'owning' the body of the deceased, have property rights in the body....

*Id.* The court annulled the order of the probate court, holding the next of kin's rights of possession and control of the body exclusive of others. *Id.* at 907–08.

One year later, in *Enos v. Snyder*, 131 Cal. 68, 63 P. 170 (1900), the California Supreme Court upheld the interests of next of kin in relation to dead bodies. In that case, Mr. Enos had directed in his will that his burial be " 'according to the wishes and directions of Mrs. R.J. Snyder,' " with whom he was living when he died. *Id.* at 171. His wife and daughter, as next of kin, sued Snyder for possession and control of the body for its disposition. Thus was raised the question: "did the respondents, as next of kin, have the right to the possession of the body of the deceased for the purpose of burying it, as

against the appellants, who claim that right under the will?" *Id.* The court resolved the question in favor of the next of kin. In doing so, it held: "in the absence of statutory provisions, there is no property in a dead body, that it is not part of the estate of the deceased person, and that a man cannot by will dispose of that which after his death will be his corpse." *Id.*

The holding of *Enos* that a person cannot by will dispose of his corpse was abrogated by statute. *See In re Henderson's Estate*, 13 Cal.App.2d 449, 57 P.2d 212, 215 (1936). The explanation that "there is no property in a dead body" has been modified by most courts addressing the subject. Following *O'Donnel* and *Pierce*, California courts commonly use the term "quasi property" to describe the rights of next of kin to the body of the deceased. *See Holm v. Superior Court*, 187 Cal.App.3d 1241, 232 Cal.Rptr. 432, 435 (1986); *Sinai Temple v. Kaplan*, 54 Cal.App.3d 1103, 127 Cal.Rptr. 80, 85 n. 13 (1976); *Cohen v. Groman Mortuary, Inc.*, 231 Cal.App.2d 1, 41 Cal.Rptr. 481, 483 (1964), *overruled on other grounds*, *Christensen v. Superior Court*, 54 Cal.3d 868, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991).

In 1931, the exclusive rights of possession, control and disposition of the corpse recognized in *O'Donnel*, together with the duty previously contained in Penal Code § 292, were codified in Health and Safety Code § 7100.[7] California has at all times recognized these rights as exclusive of oth-

---

**7.** At the time relevant to this case, the statute read:

The right to control the disposition of the remains of a deceased person, unless other directions have been given by the decedent, vests in, and the duty of interment and the liability for the reasonable cost of interment of such remains devolves upon the following in the order named:

(a) The surviving spouse.

(b) The surviving child or children of the decedent.

(c) The surviving parent or parents of the decedent.

(d) The person or persons respectively in the next degrees of kindred in the order named by the laws of California as entitled to succeed to the estate of the decedent.

(e) The public administrator when the deceased has sufficient assets.

*Id.* (amended 1999).

ers. Thus civil litigants have no right to demand an autopsy, *Walsh v. Caidin,* 232 Cal.App.3d 159, 283 Cal.Rptr. 326, 328 (1991); *Holm,* 232 Cal.Rptr. at 437, and friends of the deceased have no right to attend the burial, *Ross v. Forest Lawn Mem'l Park,* 153 Cal.App.3d 988, 203 Cal. Rptr. 468, 472 (1984), over the objection of next of kin. Violation of the correlative duty of others to refrain from disturbing the body is subject to an action for "tortious interference with a right to dispose of a decedent's remains." *Sinai Temple,* 127 Cal.Rptr. at 86; *cf. Christensen,* 2 Cal. Rptr.2d 79, 820 P.2d at 196 (permitting action for unauthorized harvesting of corneas and other organs by mortuary); *Palmquist v. Standard Acc. Ins. Co.,* 3 F.Supp. 358, 359–360 (S.D.Cal.1933) (permitting action for unauthorized retention of organs after an autopsy).

C. The Right to Transfer Body Parts

The first successful transplantation of a kidney in 1954 led to an expansion of the rights of next of kin to the bodies of the dead. In 1968, the National Conference of Commissioners on Uniform State Laws approved the Uniform Anatomical Gift Act (UAGA), adopted by California the same year, which grants next of kin the right to transfer the parts of bodies in their possession to others for medical or research purposes. Cal. Health & Safety Code § 7150 *et seq.* The right to transfer is limited. The California UAGA prohibits any person from "knowingly, for valuable consideration, purchas[ing] or sell[ing] a part for transplantation, therapy, or reconditioning, if removal of the part is intended to occur after the death of the decedent," Cal. Health & Safety Code § 7155, as does

federal law, 42 U.S.C. § 274e (prohibiting the "transfer [of] any human organ for valuable consideration"); [8] *cf. Finley v. Atl. Transport Co.,* 220 N.Y. 249, 115 N.E. 715, 717 (1917) ("[T]here is no right of property in a dead body ... as understood in the commercial sense."); *Larson v. Chase,* 47 Minn. 307, 50 N.W. 238, 239 (1891) ("[A] dead body is not property in the common commercial sense of that term[.]").

In the 1970s and 1980s, medical science improvements and the related demand for transplant organs prompted governments to search for new ways to increase the supply of organs for donation. *See* National Organ Transplant Act, Pub.L. No. 98–507, 98 Stat 2339 (1984) (establishing Task Force on Organ Transplantation and the Organ Procurement and Transplantation Network); S.Rep. No. 98–382, at 2–4 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3975, 3976–78 (discussing "major advances ... in the science of human organ transplantation," and the "need[ ] ... to encourage organ donation" to meet a supply "far short" of demand). Many perceived as a hindrance to the supply of needed organs the rule implicit in the UAGA that donations could be effected only if consent was received from the decedent or next of kin. Erik S. Jaffe, *"She's Got Bette Davis['s] Eyes": Assessing the Nonconsensual Removal of Cadaver Organs Under the Takings and Due Process Clauses,* 90 Colum. L.Rev. 528, 535 (1990); *cf.* S. Rep. 98–382 at 2 (discussing estimates that "organs are ... recovered from fewer than 15 percent" of people who die under circumstances that make them suitable donors). In response, some states passed "presumed

---

**8.** One commentator has argued that the "the very existence of a law forbidding commercial alienation of organs paradoxically portrays the human body as 'an article of commerce' that lies within the purview of congressional power and would otherwise be subject to sale on the market." Radhika Rao, *Property, Privacy, and the Human Body,* 80 B.U. L.Rev. 359, 376 (2000).

consent" laws that allow the taking and transfer of body parts by a coroner without the consent of next of kin as long as no objection to the removal is known. Jaffe, *supra* at 535–36.[9] California Government Code § 27491.47, enacted in 1983, was such a law.[10]

## III. DUE PROCESS ANALYSIS

"[T]o provide California non-profit eye banks with an adequate supply of corneal tissue," S. Com. Rep. SB 21 (Cal.1983), § 27491.47(a) authorized the coroner to "remove and release or authorize the removal and release of corneal eye tissue from a body within the coroner's custody" without any effort to notify and obtain the consent of next of kin "if . . . [t]he coroner has no knowledge of objection to the removal." The law also provided that the coroner or any person acting upon his or her request "shall [not] incur civil liability for such removal in an action brought by any person who did not object prior to the removal . . . nor be subject to criminal prosecution." § 27491.47(b).[11]

■ In analyzing whether the implementation of that law by the coroner deprived the parents of property, we define property as "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . . In other words, it deals with what lawyers term the individual's 'interest' in the thing in question." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *accord Phillips v. Washington Legal Found.*, 524 U.S. 156, 167–68, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); *cf. Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (explaining that " 'property' denotes a broad range of interests"). "To have a property interest . . . a person clearly must have more than an abstract need or desire" for the thing in question, "[h]e must, instead, have a legitimate claim of entitlement to it. . . . It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims." *Roth*, 408 U.S. at 577, 92 S.Ct. 2701.

In two decisions the Sixth Circuit, the only federal circuit to address the issue until now, held that the interests of next of kin in dead bodies recognized in Michigan and Ohio allowed next of kin to bring § 1983 actions challenging implementation of cornea removal statutes similar to California's. *Whaley v. County of Tuscola*, 58 F.3d 1111 (6th Cir.1995) (Michigan); *Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir.1991) (Ohio). The Sixth Circuit noted

---

**9.** Other laws, including the 1987 version of the UAGA, authorize the taking of body parts without consent only where a reasonable effort has been made to locate the next of kin and obtain consent to the transfer. Jaffe, *supra* at 536–537. The majority of states adhere to the original version of the UAGA, which requires consent from the donee or next of kin for any transfer of organs. *Id.* at 538.

**10.** In 1998, § 27491.47(a)(2) was amended to require that the coroner obtain written or telephonic consent of the next of kin prior to removing corneas. The Committee Report accompanying that change in law argued that "existing law governing corneal tissue removal does not adequately reflect the importance of obtaining the consent of a decedent's next-of-kin . . . . [A]natomical gifts are . . . 'gifts' and . . . the removal of corneal tissue without the consent of a decedent's next-of-kin violates the legally recognized principle that . . . an individual's right to make or decline to make an anatomical gift [is] passed on to the next-of-kin." S. Com. Rep. S.B. 1403 (1998).

**11.** For body parts other than corneas, California adopted the 1987 version of the UAGA authorizing transfer when no knowledge of objection is known and after "[a] reasonable effort has been made to locate and inform [next of kin] of their option to make, or object to making, an anatomical gift." Cal. Health & Safety Code § 7151.5(a)(2).

that courts in each state had recognized a right of next of kin to possess the body for burial and a claim by next of kin against others who disturb the body. *Whaley,* 58 F.3d at 1116; *Brotherton,* 923 F.2d at 482. Those common law rights, combined with the statutory right to control the disposition of the body recognized in each state's adoption of the UAGA, was held to be sufficient to create in next of kin a property interest in the corneas of their deceased relatives that could not be taken without due process of law. *Whaley,* 58 F.3d at 1117; *Brotherton,* 923 F.2d at 482.

The supreme courts of Florida and Georgia, however, have held that similar legal interests of next of kin in the possession of the body of a deceased family member, recognized as "quasi property" rights in each state, are "not . . . of constitutional dimension." *Georgia Lions Eye Bank, Inc. v. Lavant,* 255 Ga. 60, 335 S.E.2d 127, 128 (1985); *State v. Powell,* 497 So.2d 1188, 1191 (Fla.1986) (commenting that "[a]ll authorities generally agree that the next of kin have no property right in the remains of a decedent"). The Florida Supreme Court recently rejected the broad implications of the reasoning in *Powell,* distinguishing that decision as turning on a balance between the public health interest in cornea donation and the " 'infinitesimally small intrusion' " of their removal. *Crocker v. Pleasant,* 778 So.2d 978, 985, 988 (Fla.2001) (allowing a § 1983 action to go forward for interference with the right of next of kin to possess the body of their son because "in Florida there is a legitimate claim of entitlement by the next of kin to possession of the remains of a dece-

dent for burial or other lawful disposition").[12]

■ We agree with the reasoning of the Sixth Circuit and believe that reasoning is applicable here. Under traditional common law principles, serving a duty to protect the dignity of the human body in its final disposition that is deeply rooted in our legal history and social traditions, the parents had exclusive and legitimate claims of entitlement to possess, control, dispose and prevent the violation of the corneas and other parts of the bodies of their deceased children. With California's adoption of the UAGA, Cal. Health and Safety Code § 7151.5, it statutorily recognized other important rights of the parents in relation to the bodies of their deceased children—the right to transfer body parts and refuse to allow their transfer. These are all important components of the group of rights by which property is defined, each of which carried with it the power to exclude others from its exercise, "traditionally . . . one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435–436, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *see* Thomas W. Merrill, *Property and the Right To Exclude,* 77 Neb. L.Rev. 730, 740–752 (1998) (discussing the "primacy of the right to exclude"); Jeremy Bentham, *The Limits of Jurisprudence Defined* 164 (Charles Warren Everett ed., 1945) (stating that "[t]o give a man a property" interest in a thing, there must be "a mandate prohibiting persons at large from meddling with it"). Thus, we hold that the parents had property interests in the corneas of their deceased children protected by the

---

12. The Michigan Court of Appeals held that the rights of the next of kin to possess and control the body for burial do not create a constitutionally protected *privacy* interest in the next of kin because that interest "ends with the death of the person to whom it is of value." *Tillman v. Detroit Receiving Hosp.,* 138 Mich.App. 683, 360 N.W.2d 275, 277 (1984). We need not address that issue here because the parents have limited their due process interest to one of property.

Due Process Clause of the Fourteenth Amendment.

Our holding is not affected by California's labeling of the interests of the next of kin as "quasi property," a term with little meaningful legal significance.[13] "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim or entitlement' protected by the Due Process Clause." *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978). As the Sixth Circuit correctly recounted in *Whaley* and *Brotherton,* the identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state. *See Whaley,* 58 F.3d at 1114 (explaining that courts must "look beyond the law's nomenclature and to its substance"); *Brotherton,* 923 F.2d at 482 (holding that rights of next of kin in Ohio "form a substantial interest in the dead body, regardless of Ohio's classification of that interest"). Thus in *Brotherton,* the interests created by Ohio law were recognized as constitutionally protected property interests despite Ohio courts not characterizing the rights of next of kin to dead bodies as "quasi-property right[s]," as have "a majority of the courts confronted with the issue." *Brotherton,* 923 F.2d at 480. Similarly, in *Whaley,* the court recognized that next of kin in Michigan possessed constitutionally protected property rights to the corneas of deceased relatives even though "Michigan has repeatedly emphasized" that recovery for violation of the rights of next of kin " 'is not for the damage to the corpse *as property.*' " *Whaley,* 58 F.3d at 1116 (quoting *Keyes v. Konkel,* 119 Mich. 550, 78 N.W. 649, 649 (1899)). Our holding similarly turns on the substance of the rights California recognizes, not on the label given to them.

Nor does the fact that California forbids the trade of body parts for profit mean that next of kin lack a property interest in them. The Supreme Court has "never held that a physical item is not 'property' simply because it lacks a positive economic or market value." *Phillips,* 524 U.S. at 169, 118 S.Ct. 1925; *cf. Int'l News Service v. Assoc. Press,* 248 U.S. 215, 246, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (Holmes, J. dissenting) ("Property, a creation of law, does not arise from value . . . .").

Because the property interests of next of kin to dead bodies are firmly entrenched in the "background principles of property law," based on values and understandings contained in our legal history dating from the Roman Empire, California may not be free to alter them with exceptions that lack "a firm basis in traditional property principles." *Phillips,* 524 U.S. at 165–68, 118 S.Ct. 1925 (holding that state could legislatively exempt income only trusts and community property from long established rule that interest follows principle because those exceptions "have a historical pedigree"); *accord Washington Legal Found.*

---

**13.** The Supreme Court has used the term to identify a property interest only once. In *International News Service v. Associated Press,* 248 U.S. 215, 236–242, 39 S.Ct. 68, 63 L.Ed. 211 (1918) the majority held that news "must be regarded as quasi property," the taking of which without consent constitutes the basis for an unfair competition action. The Court's label did not affect the holding of the case. There is no entry for "quasi property" in Blacks Law Dictionary (6th Ed.1990) or Ballentine's Law Dictionary (3d ed.1969), although each contains entries for "quasi contract." The only examples of "quasi property" listed under the entry in Words and Phrases are news, citing *International News Service,* and dead bodies. 35A Words and Phrases 487 (1965); *see id.* (2000 cumulative supp.).

*v. Legal Found. of Washington,* 271 F.3d 835, 852–53 (9th Cir.2001) (en banc); *Schneider,* 151 F.3d at 1200–01; *cf. Prune-Yard Shopping Center v. Robins,* 447 U.S. 74, 93–94, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (Marshall, J. concurring) ("[T]here are limits on governmental authority to abolish 'core' commonlaw rights.").[14] We need not, however, decide whether California has transgressed basic property principles with enactment of § 27491.47 because that statute did not extinguish California's legal recognition of the property interests of the parents to the corneas of their deceased children. It allowed the removal of corneas only if "the coroner has no knowledge of objection," a provision that implicitly acknowledges the ongoing property interests of next of kin.[15]

 The effect of § 27491.47 was to remove a procedure—notice and request for consent prior to the deprivation—and a remedy—the opportunity to seek redress for the deprivation in California's courts. A state may not evade due process analysis by defining " '[p]roperty' ... by the procedures provided for its deprivation." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). "While the legislature may elect not to confer a property interest ... it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural

safeguards." *Id.* (citations omitted). With § 27491.47, California eliminated procedural safeguards but retained the interest.

When the coroner removed the corneas from the bodies of the parents' deceased children and transferred them to others, the parents could no longer possess, control, dispose or prevent the violation of those parts of their children's bodies. To borrow a metaphor used when the government physically occupies property, the coroner did not merely "take a single 'strand' from the 'bundle' of property rights: it chop[ped] through the bundle, taking a slice of every strand." *Loretto,* 458 U.S. at 435, 102 S.Ct. 3164. This was a deprivation of the most certain variety.

At bottom, "[p]roperty rights serve human values. They are recognized to that end, and are limited by it." *State v. Shack,* 58 N.J. 297, 277 A.2d 369, 372 (1971). The property rights that California affords to next of kin to the body of their deceased relatives serve the premium value our society has historically placed on protecting the dignity of the human body in its final disposition. California infringed the dignity of the bodies of the children when it extracted the corneas from those bodies without the consent of the parents. The process of law was due the parents for this deprivation of their rights.

---

**14.** Of course, states may choose between multiple legal rules that are consistent with the basic principles of the common law "at the will, or even the whim, of the legislature." *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77 (1876); *accord Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) ("Our cases have clearly established that '[a] person has no property, no vested interest, in any rule of the common law.' ") (quoting *Second Employers' Liability Cases,* 223 U.S. 1, 50, 32 S.Ct. 169, 56 L.Ed. 327 (1912)) (emphasis added).

**15.** In this respect, § 27491.47(a) differs from California law governing the state's duty to conduct autopsies to determine the cause of death which may be performed contrary to the wishes of the individual or next of kin. *See* Cal. Govt.Code § 27491; *Huntly v. Zurich Gen. Accident & Liab. Ins. Co.,* 100 Cal.App. 201, 280 P. 163 (1929) (holding next of kin have no right to prohibit state from performing invasive autopsy to determine cause of death).

## IV. POSTDEPRIVATION PROCESS

The scope of the process of law that was due the parents is not a question that we can answer based on the pleadings alone. This question must be addressed in future proceedings.

▆▆▆▆ The coroner's argument that, as a matter of law, post-deprivation process is sufficient and the parents should therefore be required to exhaust postdeprivation procedures must fail.[16] "[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). The timing of a hearing depends upon the accommodation of competing interests including the importance of the private interests, the length or finality of the deprivation and the magnitude of governmental interest. *Id.*; *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But, absent "extraordinary situations," *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), such as " 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' " the deprivation of property resulting from an established state procedure does not meet due process requirements without a predeprivation hearing. *Logan*, 455 U.S. at 436, 102 S.Ct. 1148 (quoting *Parratt*, 451 U.S. at 539, 101 S.Ct. 1908); *accord Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d

393 (1984) ("[P]ostdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action."). The coroner's removal of corneas was in accordance with the state procedures established by § 27491.47(a). Whether extraordinary situations justify the failure of the coroner to afford a predeprivation hearing turns on issues of fact that cannot be properly examined at this stage of the litigation.

▆▆▆▆ We do not hold that California lacks significant interests in obtaining corneas or other organs of the deceased in order to contribute to the lives of the living. Courts are required to evaluate carefully the state's interests in deciding what process must be due the holders of property interests for their deprivation. *Logan*, 455 U.S. at 434, 102 S.Ct. 1148; *Mathews*, 424 U.S. at 335, 96 S.Ct. 893. An interest so central to the state's core police powers as improving the health of its citizens is certainly one that must be considered seriously in determining what process the parents were due. *See Cruzan*, 497 U.S. at 262, 110 S.Ct. 2841 (explaining that states have an "unqualified interest in the preservation of human life"). But our Constitution requires the government to assert its interests and subject them to scrutiny when it invades the rights of its subjects.[17] Accordingly, we reverse the district court's dismissal of the

16. We are at a loss to understand what postdeprivation procedures might be available to the parents given that § 27491.47(b) removed their ability to seek civil redress in California's courts or press a criminal claim.

17. It has been said in another context that establishing "a culture of justification—a culture in which every exercise of power is expected to be justified"—lies at the heart of the establishment of constitutional bills of rights.

Etienne Mureinik, *A Bridge to Where? Introducing the Interim Bill of Rights,* 10 S. Afr. J. Hum. Rts. 31, 32 (1994); *Pharm. Mfr. Ass'n in re: ex parte application of the President of the Republic of South Africa,* 2000(2) SA 674, para 85 n. 107(CC) (describing holding that executive action is subject to rationality review as an "an incident of the 'culture of justification' described by Mureinik").

parents' complaint and remand for proceedings in which the government's justification for its deprivation of parents' interests may be fully aired and appropriately scrutinized.

The dismissal of the parents' § 1983 claim is REVERSED and REMANDED for further proceedings.

FERNANDEZ, Circuit Judge,
Dissenting:

I dissent because I do not believe that the asthenic legal interest in a decedent's body, which California confers upon relatives and others, should be treated as a puissant giant for federal constitutional purposes.

To begin with, it has always been true in California that absent a statute "there is no property in a dead body." *Enos v. Snyder*, 131 Cal. 68, 69, 63 P. 170, 171 (1900). For that reason, no action for conversion will lie against someone who is said to have damaged or taken a part of the body. *See Gray v. S. Pac. Co.*, 21 Cal.App.2d 240, 246, 68 P.2d 1011, 1015 (1937). To the extent that any right exists, it is, in general, merely a right to possession. *Id.* That right exists solely "for the limited purpose of determining who shall have its custody for burial." *Sinai Temple v. Kaplan*, 54 Cal.App.3d 1103, 1110, 127 Cal.Rptr. 80, 85 (1976).

Of course, any civilized state desires that the bodies of its deceased members be disposed of in an appropriate way, on grounds of decency, consideration for others, and pragmatism. And it should be done with reasonable haste and without undue acrimony.

California's statutory scheme reflects all of that. It decidedly does not confer a property right upon anyone. Assuming that a decedent has not made his own arrangements for disposal of his own earthly remains,[1] the state makes sure that somebody else will both do so and pay for it. To that end, California has provided that "[t]he right to control the disposition of the remains of a deceased person . . . vests in, and the duty of disposition and the liability for the reasonable cost of disposition of the remains devolves upon," a list of individuals. Cal. Health & Safety Code § 7100(a). Thus, this so-called right is actually in the nature of a duty and expense designed to assure that the remains will not simply be left about, but will be quickly interred. And the state has created something like a table of intestate succession for the purpose of assuring that the right and duty land firmly on a defined group. First comes the person who has a power of attorney for healthcare. Cal. Health & Safety Code § 7100(a)(1). Then comes the spouse. *Id.* at (a)(2). Then adult children, then parents, then next of kin. *Id.* at (a)(3)-(5). At the end is the public administrator, but he only gets the so-called right if there are "sufficient assets" to allow him to discharge his duty. *Id.* at (a)(6). This somewhat remarkable list surely shows just how peculiar it is to dub what we are dealing with a constitutionally protected property right. Is not it interesting that the holder of a power of attorney comes before the closest relatives, and equally interesting to see that the public administrator may wind up with the "right?" Or is it essentially a duty?

I rather think that it is really a duty rather than a right, and because a duty in one person must mean that a right is lodged in someone else, it seems pellucid that the state holds the right to demand that someone on the list bear the burden of disposing of the deceased's remains; it then makes it possible for that person to

1. *See* Cal. Health & Safety Code § 7100.1.

do so by also giving him the right to do so.[2] Again, that hardly looks like the kind of interest that United States Constitution was designed to protect.

This leads, I think, to a fairly simple proposition: when the state sees to it that the duty, with its necessarily associated right, devolves upon a person, it can constitutionally limit that duty and the right that goes with it. And that is precisely what California did when it declared that the coroner can, in the course of an autopsy, release corneal eye tissue if he "has no knowledge of objection to the removal and release of corneal tissue having been made by the decedent or any other person specified in Section 7151.5 of the Health and Safety Code." Cal. Gov't Code § 27491.47(a) (1983).[3] In that respect, it should be noted that the people referred to in § 7151.5[4] are not precisely the same as the people referred to in § 7100(a). The so-called right to consent, therefore, does not follow the so-called duty, and right, to see to interment. This, again, demonstrates just how asthenic the right conferred by § 7100(a) really is.

Nobody who has had the misfortune of having his loved ones die can fail to be moved by the prospect that somebody else will treat the loved one's former earthly vessel with disrespect. That feeling does not, however, demonstrate that California has conferred a constitutionally protected property right upon family members. In fact, it has not; it has merely given them enough of a right to allow them to fulfill their duty, and it has limited that in a number of ways. One of those ways has to do with corneal tissue. As to that, the duty may not devolve, and concomitantly

the right will be neither necessary nor constitutionally protected.

Thus, I respectfully dissent.

---

**2.** The correlative duty is for others not to interfere with this subsidiary right to inter the decedent and incur an expense.

**3.** This section has been revised and now refers to § 7151.

**4.** The list has been somewhat revised, and is now in Health and Safety Code § 7151(a).